UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

MARIE E. HERNANDEZ,

                    Plaintiff,

v.                                                      Case No.  5:08-cv-104-Oc-GRJ

MICHAEL J. ASTRUE, Commissioner of Social
Security,

                    Defendant.

_____

## ORDER

Plaintiff appeals from a final decision of the Commissioner of Social Security

("the Commissioner") denying her applications for a period of disability, disability

insurance benefits, and supplemental security income. (Doc. 1.) The Commissioner has

answered (Doc. 11), and both parties have filed briefs outlining their respective

positions. (Docs. 15 & 18.) For the reasons discussed below, the Commissioner's

decision is due to be **REVERSED** and **REMANDED** under sentence four of 42 U.S.C. §

405(g).

## I.  PROCEDURAL HISTORY

On May 25, 2005, Plaintiff filed an application for a period of disability, and

disability insurance benefits, and supplemental security income alleging a disability

onset date of January 9, 2005.[1] (R. 98-107.) Plaintiff's application was denied initially

and upon reconsideration. (R. 25-27, 73-74, 77-78.) Thereafter, Plaintiff timely pursued

---

[1] Plaintiff's application alleges January 9, 2005 as the date of her disability onset. (R. 98.)
However, the Social Security Administration subsequently recommended the onset date be adjusted to
December 1, 2004 because, as noted in the Field Office Disability Report, that is the last date that Plaintiff
engaged in substantial gainful activity.

her administrative remedies available before the Commissioner and requested a hearing before an Administrative Law Judge ("ALJ"). (R. 68.) The ALJ conducted Plaintiff's administrative hearing on April 27, 2007.[2] (R. 301-33.) The ALJ issued a decision unfavorable to Plaintiff on June 20, 2007. (R. 10-22.) Plaintiff's request for review of the hearing decision by the Social Security Administration's Office of Hearings and Appeals was denied.  (R. 4-7.) Plaintiff then appealed to this Court. (Doc. 1.)

## II. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[3] Substantial evidence is more than a scintilla in that the evidence must do more than merely "create a suspicion of the existence of [a] fact," and must include "such relevant evidence as a reasonable person would accept as adequate to support the conclusion."[4]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[5] The district court must view the evidence as a whole, taking

---

[2] Plaintiff's hearing was initially scheduled for January 9, 2007, however, the hearing was rescheduled to give Plaintiff an opportunity to seek representation. (R. 334-45.)

[3] *See* 42 U.S.C. § 405(g).

[4] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Richardson v. Perales, 402 U.S. 389, 401(1971); Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982)); *accord* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[5] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

into account evidence favorable as well as unfavorable to the decision.[6] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[7]  The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[8] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[9]

The ALJ must follow five steps in evaluating a claim of disability.[10] First, if a claimant is working at a substantial gainful activity, she is not disabled.[11] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does

---

[6] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding court must scrutinize entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding court must also consider evidence detracting from evidence on which Commissioner relied).

[7] Keeton v. Dep't Health & Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[8] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[9] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-.1511.

[10] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *See* Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[11] 20 C.F.R. § 404.1520(b).

not have a severe impairment and is not disabled.[12] Third, if a claimant's impairments meet or equal an impairment listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations, she is disabled.[13] Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[14] Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[15]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[16] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[17] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[18]

---

[12] 20 C.F.R. § 404.1520(c).

[13] Id. § 404.1520(d).

[14] Id. § 404.1520(e).

[15] Id. § 404.1520(f).

[16] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[17] Doughty, 245 F.3d at 1278 n.2.
In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.
Id. (internal citations omitted).

[18] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). Once the burden shifts to the Commissioner to show that the claimant can perform other work, the grids may come into play. Id.

4

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[19] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[20]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[21] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[22] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[23]

### III. SUMMARY OF THE RECORD EVIDENCE

Plaintiff was thirty three (33) years old at the time of the ALJ's decision on June 20, 2007. (R. 98.) She has a high school education,[24] attended college intermittently for

---

[19] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[20] Walker, 826 F.2d at 1003.

[21] Wolfe, 86 F.3d at 1077-78.

[22] See id.

[23] See Doughty v. Apfel, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

[24] Plaintiff obtained her GED. (R. 308.)

three years, and has special training as a phlebotomist. (R. 114, 308.) She has previous work experience as a receptionist and telemarketer. (R. 110, 310, 312-13.) Plaintiff contends that she has been unable to work since December 1, 2004[25] due to anxiety, mood swings, depression, bipolar disorder, anger, diabetes, anemia, and attention deficit / hyperactivity disorder ("ADHD"). (R. 27, 109, 116.) Plaintiff is insured for benefits through September 30, 2007. (R. 87.)

Plaintiff raises one issue on appeal pertaining to the ALJ's assessment of the non-exertional limitations arising from Plaintiff's mental impairments.[26] Accordingly, the Court will limit its discussion of Plaintiff's medical records to Plaintiff's mental health.

**Plaintiff's Mental Health**

The Plaintiff has a history of mental health problems since 2002 when she initiated treatment at the Miami Behavioral Health Center ("MBHC"). (R. 195.) Over the course of her treatment at MBHC between October 2002 and April 2004, she was diagnosed with: attention deficit disorder, insomnia, anxiety, and major depressive disorder—recurrent and severe. (R. 183-203.) Her treatment at MBHC included a psychiatric evaluation, pharmacological management,[27] and individual therapy sessions.

---

[25] Plaintiff's application actually alleges January 9, 2005 as the date of her disability onset. (R. 98.) However, it was subsequently amended to December 1, 2004 at the suggestion of the Social Security Administration because Plaintiff's part time job between December 1, 2004 and January 9, 2005 was found to be insufficient to constitute "substantial gainful activity."

[26] The ALJ also found Plaintiff's diabetes to be a severe impairment; however, Plaintiff does not dispute that it is adequately controlled with diet. (R. 116.)

[27] Plaintiff was prescribed several medications in varying combinations and doses including: Lexapro, Ambien, Restoril, Adderall, Wellbutrin, Stratera, Abilify, Trileptal, and Klonopin. (R. 187, 195, 197, 199.)

(R. 195.) Her global adaptive functioning ("GAF") scores[28] ranged between 50 and 57.[29] In July 2004, she was discharged from MBHC's outpatient program for her failure to follow program rules.[30]

Plaintiff initiated psychiatric treatment with Dr. Jesus Linares in June 2004 with complaints of depression, anxiety, inattentiveness, and insomnia. (R. 182.) Dr. Linares subsequently treated Plaintiff for ADHD, bipolar disorder, depression, and anxiety until May 2005. (R. 176-82.) Plaintiff's treatment with Dr. Linares consisted of pharmacological management.[31] Between June 2004 and May 2005, Dr. Linares assessed Plaintiff's GAF score to be as low as 53 and as high as 70.[32] On average, however, he rated Plaintiff's GAF in the high 50s and low 60s. (R. 176-82.) Plaintiff

---

[28] The "global assessment of functioning" is rated on a scale of 0 to 100 and is used by mental health care providers to report their judgment of an individual's overall level of functioning with respect to the individual's psychological, social, and occupational functioning without regard for impairments in functioning due to physical limitations. AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32, 34 (4th ed. 2000).

[29] A person whose score falls between **41 and 50** is described as having "[s]erious symptoms (e.g., suicidal ideation, severe obsessive rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)," whereas, a person whose score falls between **51 and 60** is described as having "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)," AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32, 34 (4th ed. 2000).

[30] (R. 183.) Plaintiff failed to show up for scheduled appointments for ninety days. Id.

[31] Dr. Linares prescribed Lexapro, Wellbutrin, Restoril, Klonopin, Cymbalta, Estazolam, Lamictol, and Concerta in varying combinations and doses in an apparent attempt to stabilize Plaintiff's symptoms. (R. 176-82.)

[32] (R. 176, 178.) A person whose score falls between **61 and 70** is described as having "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, [with] some meaningful interpersonal relationships." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32, 34 (4th ed. 2000).

discontinued treatment with Dr. Linares when she moved from Miami to Ocala, Florida in June 2005. (R. 281.)

Plaintiff reported to Paul A. Feria. Ph.D, a licensed clinical psychologist, for a consultative psychological examination in July 2005. (R. 204-05.) Plaintiff complained of anxiety, panic attacks, feelings of depression, mood swings, and impulsivity. (R. 204-05.) Plaintiff advised that she engaged in certain behaviors in response to her feelings of anxiety such as: scratching her face, picking hairs from her arms, and cleaning late into the night. Plaintiff also advised that she has difficulty coping as a result of caring for three children who all have mental health issues.[33] She informed Dr. Feria that even minor events (e.g., going out to a fast food restaurant) were difficult for her because her children were difficult to control. (R. 204.) She reported that she has difficulty waking up on time, prefers to stay at home in bed all day rather than going out, and "does not like to deal with people." (R. 204-05.)

Dr. Feria noted that Plaintiff has a history of bipolar disorder and ADHD and that Plaintiff "does enjoy shopping and visiting friends on occasion . . . [but] [s]he also describes periods of time during which she does not want to get out of bed." Plaintiff was reportedly arrested in 2003 for shoplifting. (R. 205.)

Upon examination, Dr. Feria observed that Plaintiff's affect was "noticeably constricted" and her mood was somber. Plaintiff had a limited attention span but was alert and oriented to time, place, and person, and denied experiencing auditory or visual

---

[33] One of her children reportedly has bipolar disorder and ADHD, and the other two have ADHD and depression. (R. 204, 254.)

distortions. Plaintiff was capable of performing a series of routine cognitive tests although her memory was somewhat impaired.[34] Dr. Feria opined that her ability to sustain attention was "somewhat poor." Plaintiff's responses to common sense questions suggested fair to poor judgment. Dr. Feria's impression was bipolar disorder (by history). (R. 205.)

In September 2005, Lee Reback, Psy.D, a state agency psychologist, reviewed Plaintiff's medical records[35] and concluded: Plaintiff was moderately limited in her abilities to carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; maintain socially appropriate behavior; and respond appropriately to changes in the work setting. (R. 206-23.) In his review of Plaintiff's medical records, the psychologist noted that the Plaintiff has three children who also suffer from psychiatric conditions "which causes some problems within the home." (R. 222.) He also noted that Plaintiff's "self care activities are inconsistent and [she] needs prompting from her boyfriend to attend to certain activities . . . [and] she [reportedly] will spend the day trying to complete daily household chores." He concluded that "given her current clinical presentation" Plaintiff should undergo further medical evaluation. (R. 220-22.)

---

[34] "She was able to recall a sequence of five digits in the forward direction and four in reverse order. . . [and] was able to recall two out of three items after a brief interval of time." (R. 205.)

[35] Apparently, the most recent medical report Dr. Reback reviewed in rendering his opinion was Plaintiff's July 2005 mental status examination. (R. 222.)

Upon moving to Ocala, Plaintiff initiated treatment at the Marion-Citrus Mental Health Center and The Centers in October 2005 after running out of her medication.[36] Plaintiff complained of depression, isolation, low energy, poor memory, poor concentration, sleep problems, and anxiety. She advised that she had been treated for ADHD in Miami. (R. 285.) Mental status examination revealed that Plaintiff was alert and oriented to time, place, and person but had depressed mood, flat affect, short term memory impairment, inattentiveness, poor impulse control, and appetitite loss. (R. 281.) She was diagnosed with bipolar disorder, depression, and anxiety disorder, and assigned a GAF score of 55. (R. 284.) Plaintiff was prescribed medication and referred to counseling at The Centers. (R. 285.)

In early December 2005, Walter P. Shepherd, Ph.D, a second state agency psychologist, reviewed Plaintiff's medical records[37] and concluded: Plaintiff was moderately limited in her abilities to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; respond appropriately to changes in the work setting; and set realistic goals or make plans

---

[36] (R. 247-85.) She reported that she had been out of medication for a week. (R. 281.)

[37] The most recent medical record cited by Dr. Shepherd in his report was dated October 14, 2005. (R. 236.) There are no medical reports in the record dated October 14, 2005; however, Plaintiff initiated treatment at the Marion-Citrus Mental Health Center on October 24, 2005 upon moving to Ocala, Florida. Although Dr. Shepherd remarked that "no worsening [was] noted," it is unclear how Marion-Citrus Mental Health Center's staff would have been in a position to comment on whether Plaintiff's condition had worsened during Plaintiff's initial office visit.

independently of others. (R. 224-41.) In his review of Plaintiff's medical records, the psychologist opined that Plaintiff is capable of understanding, remembering, and carrying out simple but not detailed instructions, and engaging in routine/repetitive tasks. However, he noted that Plaintiff would have difficulty with "tasks requiring sustained focus and complex mental demands" and also with high stress situations. He also noted that intense or prolonged social contact would be a problem for Plaintiff although he opined that she is "able to interact appropriately on a limited basis." (R. 240.)

Plaintiff subsequently underwent a psychiatric assessment at The Centers in late December 2005. (R. 271-74.) Plaintiff complained of feelings of depression, isolation, crying spells, sadness, episodic fluctuations in her energy level, feelings of anger, anxiety, irritability, poor concentration and emotional outbursts. Plaintiff reported that she had been depressed for three years, but her symptoms had recently gotten worse. She denied feelings of paranoia. Her mental status examination revealed that she was well-groomed and cooperative with normal speech and thought processes, but with a depressed and labile mood with a sad affect. Her recall was normal and she could solve mathematical problems and interpret proverbs. She was alert and oriented as to time, place, and person but demonstrated impaired short term memory.[38] Plaintiff demonstrated "fair" insight and judgment and her GAF score was rated at 48.

In January 2006, Plaintiff returned to The Centers with complaints of increased anxiety, occasional irritability, and sleeping problems. (R. 270.) Plaintiff reported that, as

---

[38] She was able to recall only one out of three words within five minute time frame. (R. 273.)

a result of her anxiety, she was picking her skin. Upon examination, Plaintiff was alert and oriented, had a calm mood and demonstrated a well organized thought process. Her GAF was rated a 48. Plaintiff's medications were adjusted and she was instructed to return in one month.

Plaintiff returned for a follow up visit in April 2006 with complaints of having "bad thoughts," anxiety, irritability, and increased symptoms and difficulties. Plaintiff reported that she was having family problems—specifically, her son was in a program for sexual offenders. The mental health practitioner noted that Plaintiff was out of medication and had missed her previous appointment due to transportation problems. Examination revealed Plaintiff was alert and oriented with a depressed mood and constricted affect. Her GAF was noted to be 48. (R. 269.)

In June 2006, Plaintiff reported with complaints of anxiety, depression, and episodes of impulsive spending and feelings of being able to "do anything". She also complained that she was not doing well on her current medications—that they were not working. Examination revealed depressed mood but was otherwise unremarkable. Her GAF was once again rated as 48. (R. 267.)

Plaintiff returned for treatment in January 2007 with complaints of depression, anxiety, compulsions, panic attacks, poor impulse control, difficulty making decisions, low libido, fatigue, sleep problems, and suicidal ideations. She reported that she did not have any friends in Ocala, and that she does not pick up the phone when friends from Miami call her. She isolates herself and avoids going outside whenever possible. She disclosed that she is having difficulty getting along with her husband because she

"snaps" and yells at him. She argues with him daily. Plaintiff also advised that she has difficulty being on time, and needs assistance coping with her activities of daily living because they overwhelm her. She reported feeling stressed by having to cope with her son's bipolar symptoms.[39] Plaintiff also advised that her anxiety compelled her to bite her nails, pick at her skin, wash her hands frequently, compulsively clean, have panic attacks, and fear enclosed spaces. According to Plaintiff, she was afraid of being home alone because she would hear noises and think that someone was breaking into her house.

Examination revealed Plaintiff had a depressed and anxious mood and a sad affect. (R. 253.) She bit her nails during the assessment and was slow to understand and respond to questions until her anxiety subsided. She was diagnosed with bipolar disorder, ADHD, obsessive compulsive disorder, and panic disorder and assigned a GAF score of 42. (R. 261-66.) She was prescribed medication and referred for a psychiatric assessment. (R. 265.)

Dr. A. V. Nanjundasamy, a staff psychiatrist at The Centers, performed a psychiatric evaluation of Plaintiff in February 2007. (R. 250-52.) Dr. Nanjundasamy noted that Plaintiff had a history of noncompliance with treatment in that she failed to get blood lab tests done and missed her appointments from July 2006 to December 2006 due to her inability to find someone to watch her children. However, he also noted that Plaintiff claimed to have been taking her medications as prescribed. Plaintiff

---

[39] For example, her son reportedly has a history of being hospitalized and behavioral problems resulting in school suspensions. (R. 262.)

complained of sleep problems, irritability, anger problems, mood swings, inability to focus, being overwhelmed at times, anxiety, compulsive behavior, depression, and difficulty making decisions. Plaintiff reported that her son had been sent to a boy's home in Saint Augustine, Florida, because he touched his siblings inappropriately.

Mental status examination revealed that Plaintiff had an anxious facial expression, depressed mood, and constricted affect. Her rate and productivity of speech and thought processes were normal. She denied suicidal ideations although she admitted obsessive thoughts about and a preoccupation with death. Her memory was fair, and her attention and concentration were good.  Her abstract thinking was poor. Dr. Nanjundasamy diagnosed Plaintiff with severe bipolar I disorder, mixed, without psychotic features and obsessive compulsive disorder. He assigned her a GAF score of 42. (R. 250-51.)

In March 2007, Plaintiff presented to Dr. Nanjundasamy complaining that she continues to feel depressed. Plaintiff reported that she "continues to have paranoid thoughts. She becomes suspicious while at home. She thinks somebody will break in." (R. 247.) Plaintiff also advised that her medications were not helping. Dr. Nanjundasamy noted that her response to intervention was poor and adjusted her medications. He diagnosed her with severe bipolar I disorder, mixed, with psychotic features and assessed her GAF score as 42. (R. 247-48.)

Dr. Nanjundasamy completed a form entitled "Medical Opinion Re: Ability to Do Work-Related Activities (Mental)" on Plaintiff's behalf on March 13, 2007. (R. 243-46.)

He opined that Plaintiff had a "fair"[40] ability to: remember work-like procedures; understand, remember and carry out very short and simple instructions; understand and remember detailed instructions; maintain attention for a two hour period of time; maintain regular attendance and be punctual; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; be aware of normal hazards and take appropriate precautions; set realistic goals or make plans independently of others; deal with stress of semiskilled and skilled work; interact appropriately with the general public; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; travel in unfamiliar place; and use public transportation. He further opined that Plaintiff had a "poor to no ability"[41] to: make simple work-related decisions; deal with normal work stress; or carry out detailed instructions. Dr. Nanjundasamy explained that Plaintiff continued to be depressed, got frustrated and loses her temper easily, is unable to focus, and remains withdrawn. (R. 243-46.)

---

[40] The form instructed the psychiatrist to complete the form using the definition of "fair" to mean that Plaintiff's ability to function in this area is "seriously limited, but not [completely] precluded." (R. 243.)

[41] The form defined "poor to none" to mean that Plaintiff has "no useful ability to function in this area." (R. 243.)

At the hearing on April 27, 2007, Plaintiff testified that she has anxiety, panic attacks, mood swings, depressed mood, lack of concentration and experiences great difficulty with decisionmaking.  (R. 310, 314-15, 316-20, 326.) According to Plaintiff, when she is experiencing a panic attack, her heart races, she gets very nervous, starts shaking and crying, and feels like she is unable to breathe. (R. 319.) During her testimony, Plaintiff described her aversion to social situations, low tolerance for stress, difficulty sitting still, and difficulty being punctual. (R. 314-20.) She also described experiencing periods of depression followed by manic episodes.[42]

Plaintiff testified that she attempts to cope with her various symptoms by avoiding going outside of her home, and often retreating to her bed which she describes as her "comfort zone." (R. 310, 319, 321.) In fact, Plaintiff complained that she has gained weight due to her anxiety and spending most of her days in bed. (R. 310.) She testified that she does not exercise because she lacks energy and because she believes it would require her to be around other people which makes her nervous. (R. 315.) Plaintiff testified that she does leave her home to drive her children to and from school—but she relies on her husband to help her leave the house on time. (R. 320.) She also does some grocery shopping for the family—but does not go to the store alone. (R. 323.) Plaintiff testified that she typically does not engage in any social activities, but she occasionally goes to church when her children beg her to. (R. 324.) She testified that she is supposed to do the household chores (e.g., washing dishes, vacuuming,

---

[42] (R. 317-19, 326.) A "manic episode" is characterized by a "period[] of persistent and significant elevated . . . or irritable mood, and associated symptoms including decreased sleep, . . . racing thoughts, flight of ideas, grandiosity, . . . poor judgment" and higher energy level. STEDMAN'S MEDICAL DICTIONARY, *Manic Episode* 658 (28th ed. 2006); *see also* id. at 681 (defining "manic excitement").

sweeping, cleaning) - but often spends most of the day in bed because she is anxious, or because she lacks energy and motivation to do anything. (R. 310, 319-20, 325.) She also expressed having a difficult time caring for her children without her husband's help. Plaintiff explained that she experiences "extreme" shifts in her energy level and mood. According to Plaintiff, she goes through "different phases"—when she is feeling depressed, she is unmotivated and lacks the energy to do anything around the house. However, she also experiences periods of time where she has a lot of energy and "feel[s] like doing everything around the house." (R. 326.) Plaintiff testified that, when she does not complete household tasks, her husband will do it. (R. 325.)

Plaintiff testified that, in the past ten years, she has worked as a telemarketer and as a receptionist in a doctor's office. (R. 312-14.) She quit her telemarketing jobs because the work was too stressful and she "couldnt handle it." One of the telemarketing positions she held required her to meet specific quotas. According to Plaintiff, trying to meet the quotas made her anxious and would cause her to have panic attacks. (R. 313, 317.)

Plaintiff testified that she quit her job working as a receptionist because she had problems being on time, the job was stressful, she was overwhelmed by her job duties and all of the decision-making they required, she was assigned tasks that made her uncomfortable, and she was unable to get along with her coworkers. (R. 313, 315-17.) Plaintiff testified that her coworkers irritated her and she resented them because she believed she got stuck doing more than her share of work. She stated that she had difficulty communicating with her coworkers, and talking to them would upset her.

According to Plaintiff, interacting with her coworkers often upset her and made her emotional. When she got upset at work, she would cry. (R. 314-16.)

Plaintiff is currently taking Lithium, Klonopin, Wellbutrin, Abilify, and Lamictol as prescribed by her treating physician, Dr. Nanjundasamy, for depression, anxiety, and bipolar disorder. According to Plaintiff, Dr. Nanjundasamy monitors her response to her medications and he is working with her to find the right combination. (R. 318.) Plaintiff testified that while her medications do help a little bit, they do not completely resolve her problems and she still experiences a lot of anxiety and mood swings. (R. 318-19.)

**ALJ's Findings**

Based on his review of the record, including Plaintiff's testimony, medical records from several health care providers, and testimony from a vocational expert ("VE"), the ALJ determined that Plaintiff's bipolar disorder and diabetes mellitus were severe impairments. (R. 15.) However, the ALJ determined that Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the impairments listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations. (R. 16.)

The ALJ then found that Plaintiff retained the RFC to perform work at sedentary to light exertional levels subject to non-exertional limitations. (R. 22.) According to the ALJ, Plaintiff has the RFC to sit, stand, and walk six hours in an eight hour workday and lift ten pounds. As for mental impairments, the ALJ found that Plaintiff can perform simple and repetitive tasks on a sustained basis and that Plaintiff must work in a low stress environment. (R. 16.) The ALJ also found that Plaintiff has no more than mild

restrictions of activities of daily living and mild limitations in social functioning with no

evidence of any episodes of decompensation in her mental status. (R. 20-21.)

After finding that Plaintiff could not perform her past relevant work as a

receptionist or telemarketer, the ALJ consulted a vocational expert ("VE"). The VE's

testimony in response to the hypotheticals presented by the ALJ was as follows:

Q **[H]ypothetical one.** It is based largely on . . . [the] residual functional capacity assessments prepared by Dr. Shepherd in December of '05. . . [A]ssume an individual of the [Plaintiff's] age, education, and experience. This individual requires work which is low stress, simple, unskilled, one, two, to three-step instructions. Can lift and carry no more than ten pounds, stand two [hours], sit six [hours]. Should avoid frequent ascending and descending stairs. Can perform pushing and pulling motions with upper and lower extremities within the aforementioned weight restrictions. Can perform bilateral manual dexterity. Should avoid hazards in the workplace. Occasional postural activities. Has psychologically based symptoms which affect her ability to concentrate upon complex or detailed tasks but would remain capable of understanding, remembering, and carrying out simple job instructions. . . .
. . .

Do you have an opinion whether there are any unskilled occupations such an individual [could perform] within that given profile?

A Yes. She could perform unskilled . . . such as surveillance system monitor . . . order clerk, food and beverage . . .

. . . .

[and] [f]inal assembler. . .

. . . .

Q Assume further in **hypothetical two** individual has mild restrictions of activities of daily living, . . . maintains moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, and pace. . .

. . . .

. . . Does that change your answer in any way?

A No, Your Honor.

Q . . . **Hypothetical three**. Assume the individual has the additional non-exertional limitations, moderate ability to carry out detailed instructions, moderate ability to maintain attention and concentration for extended periods, moderate ability to complete a normal workday, moderate . . . limitation to interact appropriately with the general public, moderate

limitation in ability to respond appropriately to changes in the workplace. Moderate . . . limitation in the ability to set realistic goals and make plans independently. Would that change your answer in any way?

. . . .

A      I believe that would eliminate the positions that I mentioned and all past relevant work.

Q      . . . [**Hypothetical four**] is based largely upon Exhibit 8F.[43] Limitations poor to none in making simple work-related decisions, poor to none to deal with normal work stress, poor to none to carry out detailed instructions. Would that change your answer in any way?

A      That would, again, eliminate all jobs. . . . and past relevant work.

(R. 329-32) (emphasis added).

The ALJ concluded that an individual of Plaintiff's age, education, work experience, and residual functional capacity was capable of performing jobs that exist in significant numbers in the national economy. (R. 21.) In reaching this conclusion, the ALJ relied on the testimony of a vocational expert. Accordingly, the ALJ found that Plaintiff was not disabled. (R. 22.)

## IV. DISCUSSION

Plaintiff raises one issue on appeal concerning the ALJ's reliance on vocational expert ("VE") testimony that failed to incorporate all of Plaintiff's non-exertional limitations. Plaintiff argues that the ALJ committed reversible error in rejecting the opinion of Dr. Nanjundasamy, Plaintiff's current treating psychiatrist, with regard to the non-exertional limitations associated with Plaintiff's mental impairments.

The record evidence shows that Plaintiff has a long history of mental illness including diagnoses for bipolar disorder, severe depression, anxiety disorder with panic

---

[43] Exhibit 8F is the form entitled "Medical Opinion Re: Ability to Do Work-Related Activities" that Dr. Nanjundasamy completed in March 2007. (R. 243-46.)

attacks, obsessive compulsive disorder, and ADHD. The ALJ deemed Plaintiff's bipolar disorder to constitute a severe impairment not meeting or equaling a listed impairment, but precluding Plaintiff from performing her past relevant work. (R. 21.) At step five in the sequential analysis, the ALJ consulted a vocational expert ("VE") to help him assess the impact of the non-exertional limitations associated with Plaintiff's mental impairments on Plaintiff's ability to perform "other work." (R. 22.) In doing so, the ALJ elicited testimony from the VE based upon four hypothetical questions.[44]

Plaintiff argues that, when the ALJ ignored the VE testimony in response to hypothetical questions three and four, the ALJ improperly rejected non-exertional limitations that had been identified by Plaintiff's treating psychiatrist, Dr. Nanjundasamy. In opposition, the Commissioner argues that the ALJ properly relied upon VE testimony based on hypothetical questions that adequately described Plaintiff's exertional and non-exertional limitations. According to the Commissioner, the ALJ did not err in disregarding the functional limitations identified by Dr. Nanjundasamy because Dr. Nanjundasamy's opinion was inconsistent with his own progress notes, the overall objective medical evidence as well as other evidence of Plaintiff's activities. For the following reasons, the Court finds that the ALJ's reliance on the VE's testimony was not supported by substantial evidence.

In the Eleventh Circuit, the law is clear that substantial or considerable weight must be given to the opinion, diagnosis, and medical evidence of a treating physician

---

[44] *See* text *supra*, pp. 19-20.

absent a showing of "good cause" to the contrary.[45] A treating physician's opinion on the nature and severity of a claimant's impairments is to be given controlling weight where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record.[46]

When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence supporting the opinion; (4) consistency with the record a whole; (5) specialization in the medical issues at issue; and (6) other factors which tend to support or contradict the opinion.[47] "When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate his reasons."[48]

One of the reasons for finding that Dr. Nanjundasamy's "extreme" opinion was entitled to "little weight" was because Dr. Nanjundasamy's opinion was not consistent with his own progress notes. For example, the ALJ points to a portion of a March 2007 progress note in which Dr. Nanjundasamy recounts something Plaintiff told him during her office visit. Specifically, she advised him that she "continues to have paranoid thoughts. She becomes suspicious while at home. She thinks somebody will break in." (R. 247.) The ALJ found this to be inconsistent because Dr. Nanjundasamy did not

---

[45] Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1159 (11th Cir. 2004); O'Neal v. Astrue, 5:07-cv-143-Oc-10GRJ, 2008 WL 2439885, at *3 (M.D. Fla. June 13, 2008); *see also* 20 C.F.R. § 404.1527(d) (describing the manner in which the ALJ is to evaluate medical evidence).

[46] 20 C.F.R. § 404.1527(d)(2).

[47] 20 C.F.R. § 404.1527(d).

[48] Phillips v. Barnhart, 357 F.3d 1232, 1240-41 (11th Cir. 2004).

make "such findings" in his prior progress notes. The problem with this finding is that Dr. Nanjundasamy is only one of several mental health care providers at The Centers who contributed to Plaintiff's treatment. A January 2007 progress note from the Centers substantiates Dr. Nanjundasamy's progress note. During an office visit in January 2007, Plaintiff mentioned that, when she is home alone, she hears noises and fears someone may be breaking into her home. (R. 253.) Furthermore, the mere fact that Plaintiff mentioned her feelings of paranoia to Dr. Nanjundasamy for the first time during an office visit at some point after she first began to experience them does not necessarily equate to a contradictory or conflicting finding on the part of Dr. Nanjundasamy. It is not inconceivable that new symptoms may appear (or reappear) over the course of a chronic and cyclical illness such as bipolar disorder.

In further support of his decision not to give controlling weight to the opinion of Dr. Nanjundasamy, the ALJ also points to Dr. Nanjundasamy's notation that Plaintiff's attention and concentration were "good" during mental status examinations as contradicting his assessment that Plaintiff's ability to concentrate is seriously limited.

With respect to the evaluation of a disability on the basis of a mental disorder, the regulations recognize that an individual's level of functioning may fluctuate over time. "Proper evaluation of [mental] impairment(s) must take into account any variations in the level of [an individual's] functioning in arriving at a determination of severity over time."[49] In fact, "[l]imitations in concentration, persistence, or pace are best observed in work settings . . . In addition, major limitations in this area can often be assessed through

_____

[49] 20 C.F.R. § 404, subpt. P, app. 1, 12.00(D)(2); *see also* id. at 12.00(C)(3).

clinical examination . . . Whenever possible, however, a mental status examination . . . should be supplemented by other available evidence."[50] The ALJ took Dr. Nanjundasamy's clinical findings out of context by considering them in isolation. Plaintiff's medical records are replete with references to Plaintiff's inability to focus and difficulty concentrating. (R. 176-79, 182, 205, 264, 271-74, 281, 285.) Thus, Dr. Nanjundasamy's clinical findings that Plaintiff's attention and concentration were "good" during two office visits do not contradict his opinion that Plaintiff experiences difficulties with concentration on an ongoing basis. Such mental status examination findings merely document that Plaintiff apparently did not experience these difficulties *during highly structured* and *brief* clinical exams.[51] As recognized by the Social Security Administration's regulations, when evaluating the impact of chronic mental impairments on an individual's capacity to work, "[t]he results of a single examination may not adequately describe [the individual's] sustained ability to function."[52]

The ALJ's failure to point to anything in Dr. Nanjundasamy's treatment notes that contradicts or conflicts with Plaintiff's other medical records is further compounded by the fact that the ALJ rejected findings that are actually well-supported by the objective medical evidence. For example, the ALJ pointed to Dr. Nanjundasamy's assessment that Plaintiff had a GAF of 42 and correctly noted that an individual with such a low GAF would have "very serious limitations in social and occupational functioning . . . or

---

[50] Id. at 12.00(C)(3).

[51] *See, e.g.*, id. 12.00(E) (evaluation of chronic mental impairments).

[52] 20 C.F.R. § 404, subpt. P, app. 1, 12.00(E).

significant problems with concentration." (R. 20.) According to the ALJ, Dr. Nanjundasamy's assessment was inconsistent with the opinions of: Dr. Linares, a prior treating physician; Dr. Feria, a consulting examining physician; and two non-examining state agency psychologists, Dr. Reback and Dr. Shepherd.

The ALJ commented that Dr. Linares' progress notes demonstrated that, when Plaintiff was "stabilized" on medications, her mental status examinations were within normal limits and her GAF score ranged between 55 and 70. This characterization of Dr. Linares' findings is flawed for two reasons. First, Dr. Linares' progress notes never clearly state whether Plaintiff's symptoms ever "stabilized" and, over the course of his treatment of Plaintiff, Dr. Linares prescribed at least eight different medications in varying combinations and doses in an attempt to treat Plaintiff's symptoms. (R. 176-82.) Second, in addition to the absence of any suggestion in Dr. Linares' notes that Plaintiff's symptoms ever "stabilized," less than half of his mental status examinations of Plaintiff could even be considered "within normal limits." During four of the seven examinations, Plaintiff demonstrated one or more abnormalities such as: depressed mood, elevated affect, anxiety, impaired judgment, and impaired insight. (R. 177, 179, 180, 182.) Therefore, the ALJ reliance on Dr. Linares' progress notes to discredit Dr. Nanjundasamy's opinion was not supported by the substantial evidence of record.

In rejecting Dr. Nanjundasamy's opinion, the ALJ also relied on Dr. Feria's July 2005 consultative examination. The ALJ noted that, although Dr. Feria found Plaintiff's ability to sustain attention was somewhat "poor", Dr. Feria also found that Plaintiff could

derive meaning from simple proverbs,[53] was capable of managing her own funds, could perform reverse counting procedure and serial sevens, and could identify the five largest cities in United States.

The ALJ failed to mention, however, that Dr. Feria also observed that Plaintiff's insight and judgment were "poor" and her memory was impaired. (R. 205.) Additionally, as previously discussed, Plaintiff's ability to complete simple cognitive tasks over a short period of time in a highly structured environment does not say much about the Plaintiff's ability to perform work-related tasks on a sustained basis.[54] Furthermore, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion unless the overall evidence supports a contrary finding.[55]

Significantly, the "objective medical evidence" that the ALJ most heavily relied upon to discount Dr. Nanjundasamy's opinion consisted of the residual functional capacity assessments prepared by two state agency non-examining psychologists, Dr. Reback and Dr. Shepherd. The ALJ expressly cited Dr. Shepherd's report when presenting the first three hypotheticals to the VE (R. 329-32) and, in formulating Plaintiff's RFC, the ALJ explicitly distinguished Dr. Nanjundasamy's opinion from those of both Dr. Shepherd and Dr. Reback. (R. 19-21.) Specifically, the ALJ referenced their findings that: (1) although Plaintiff's concentration is impaired, Plaintiff is capable of

---

[53] This indicates Plaintiff is capable of abstract thinking. H. CARL HAYWOOD & CAROL S. LIDZ, DYNAMIC ASSESSMENT IN PRACTICE 50 (2006).

[54] *See* 20 C.F.R. § 404, subpt. P, app. 1, 12.00(E).

[55] Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir. 1984);  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997); *see also* 20 C.F.R. § 404.1527(d)(2).

"perform[ing] simple and repetitive tasks on a sustained basis"; (2) Plaintiff's mental impairments cause "no more than mild restrictions of activities of daily living"; and (3) Plaintiff has "no limitations with social interaction with coworkers, peers or to accept criticism from supervisors." (R. 19-20.)

The ALJ's deference to the opinions of Dr. Reback and Dr. Shepherd was not supported by substantial evidence because, while attempting to distinguish their respective opinions from Dr. Nanjundasamy's, the ALJ mischaracterized their findings.

For example, the ALJ's statement that Dr. Reback and Dr. Shepherd "had the opportunity to review the medical evidence" is misleading because the ALJ failed to mention that *neither* Dr. Reback nor Dr. Shepherd had the benefit of reviewing Dr. Nanjundasamy's medical source statement while preparing their assessments. Dr. Nanjundasamy did not render his opinion until well after Dr. Reback and Dr. Shepherd had already submitted their reports. In fact, neither of the non-examining psychologists could have reviewed *any* of the medical records from Plaintiff's current mental health care providers because Plaintiff did not initiate treatment at the Marion-Citrus Mental Health Center and The Centers until October 2005. Accordingly, the assessments of Plaintiff by the non-examining psychologists - upon which the ALJ relied heavily - do not contradict Dr. Nanjundasamy's findings because neither of non-examining state psychologist reviewed or even considered Dr. Nanjundasamy's conclusions and findings when rendering their opinions.

Second, notwithstanding the fact that neither of the non-examining psychologists even reviewed Dr. Nanjundasamy's progress notes or medical source statement, their

opinions *support*, rather than contradict, Dr. Nanjundasamy. For example, contrary to the ALJ's finding that Plaintiff is capable of "perform[ing] simple and repetitive tasks on a sustained basis," Dr. Shepherd actually concluded that Plaintiff was capable of such tasks subject to the exception that she "will have difficulty with tasks requiring sustained focus." (R. 240.)

The ALJ also stated that he "agree[d] with the psychologist who opined that [Plaintiff] ha[s] no limitations with social interaction with coworkers, peers or supervisors"[56] and found that Plaintiff has "no more than mild limitations in her ability to socialize and would not impact limitations in her ability to work." (R. 20.) While Dr. Reback checked the boxes on the form which seem to indicate he was of the opinion that Plaintiff's social functioning was minimally impaired, he noted that Plaintiff "has limited contact with others outside of her home" and ultimately concluded that Plaintiff's "current clinical presentation" warranted further medical evaluation. (R. 220-22.) Two months later, Dr. Shepherd reviewed Plaintiff's medical records and found that Plaintiff *does* have limitations in her social functioning. In particular, he noted that Plaintiff "doesn't like speaking to people she does not know" (R. 236) and found that Plaintiff "may have problems with intense/prolonged social contact but is able to interact appropriately on a *limited basis*." (R. 240.)

Plaintiff's testimony, as well as medical records (including Dr. Nanjundasamy's progress notes) prepared after Dr. Shepherd's opinion further highlight the extent to which Plaintiff's mental impairments may impact her ability to interact socially. Plaintiff

[56] The Court interprets this statement to be referring to Dr. Reback's opinion.

advised her mental health providers that she has uncontrollable emotional outbursts, suicidal ideations, poor impulse control, severe mood swings, and that she is irritable and loses her patience with others easily. Plaintiff also reported that she has no friends in Ocala, avoids phone calls from family and her friends from Miami, argues with her husband on a daily basis, avoids public places, intentionally isolates herself from others, and she dreads taking her children to school because she does not like to leave the house. Progress notes also note that Plaintiff has frequent panic attacks which compel her to spend most of her time in bed. All of this evidence, which was not considered by the non-examining state agency physicians, is consistent with Dr. Nanjundasamy's opinion that Plaintiff's social functioning is seriously impaired.

In sum, the ALJ's reliance upon the opinions of the non-examining physicians was reversible error because, "the opinions of non-examining, reviewing physicians . . . when contrary to those of [an] examining physician are entitled to little weight, and standing alone do not constitute substantial evidence."[57]

Lastly, the ALJ discounted Dr. Nanjundasamy's view that Plaintiff's mental impairments seriously limit Plaintiff's ability to complete activities of daily living. Instead, the ALJ concluded that other evidence of Plaintiff's activities in the record supported a finding that Plaintiff was no more than mildly limited in her ability to complete activities of daily living. According to the ALJ, "[Plaintiff's] testimony and other reports show she is able to fully function. She is able to care for her children and drive them back and forth to school . . . is able to go to the grocery store . . . [and] attends church." This finding,

---

[57] Sharfarz v. Bowen, 825 F.2d 278, 280 (11th Cir. 1987).

however, directly conflicts with the Plaintiff's testimony as well as notations in Plaintiff's medical records. For example, during the hearing Plaintiff explained that she is capable of driving her children to school but she relies on her husband to remind her so that she gets them there on time. (R. 320.) In fact, because her husband is not there in the afternoon to remind her, she testified that she is usually late to pick her children up from school. (R. 320-22.) This is consistent with Dr. Nanjundasamy's opinion that Plaintiff is seriously limited in her ability to "maintain regular attendance and be punctual." (R. 244.)

Plaintiff's testimony that she is overwhelmed by the task of caring for her children is bolstered by the fact that all three of her children have mental health issues and her medical records make repeated references to Plaintiff being unable to "cope" with their behavioral problems. In fact, one of her sons is experiencing substantial problems—both at home and at school—due to his mental illnesses and was sent to reformatory school.

Plaintiff did testify that she was able to go to the grocery store; however, due to her anxiety and difficulty with decision-making, she does not go alone. (R. 323.) Plaintiff also testified that she attends church—but she only goes one or two times per year. (R. 256, 324.)

The ALJ also references Plaintiff's ability to take care of her household needs. However, the ALJ failed to recognize Plaintiff's testimony describing the episodic nature of her mental impairment which causes her to experience periods of time in which she is unable to do much—if any—housework, followed by periods of high productivity. (R.

30

324-36.) Accordingly, the ALJ's conclusion that Plaintiff "has only mild restrictions of activities of daily living" is not supported by substantial evidence.

Because the ALJ's articulated reasons for "accord[ing] little weight to the opinion of Dr. Nanjundasamy" do not amount to "good cause,"[58] the ALJ's assessment of Plaintiff's RFC is not supported by substantial evidence. An ALJ commits reversible error at step five if he relies on VE testimony that is unsupported by substantial evidence.[59] In order for the testimony of a VE to constitute "substantial evidence," the ALJ "must pose a hypothetical question which comprises all of the claimant's [documented] impairments.'"[60] Because Plaintiff's RFC was flawed, the VE testimony necessarily failed to incorporate all of Plaintiff's functional limitations. Accordingly, on remand the ALJ will be required to accord appropriate weight to the opinion of Dr. Nanjundasamy in evaluating the Plaintiff's mental RFC and then utilizing the RFC, which properly takes into account all of the Plaintiff's mental limitations, present new hypothetical questions to a vocational expert to determine whether there are significant numbers of jobs available in the national economy at the Plaintiff's residual functional capacity.

---

[58] Good causes "exist[s] where the doctor's opinion [is] not bolstered by the evidence, . . . where the evidence support[s] a contrary finding, . . . or where the doctors' opinions [are] conclusory or inconsistent with their own medical records." Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997).

[59] Hart v. Comm'r of Soc. Sec., No. 6:07-cv-719-ORL-DAB, 2008 WL 2686341, at *6 (M.D. Fla. June 27, 2008) (citing Pendley v. Heckler, 767 F.2d 1561, 1561 (11th Cir. 1985)).

[60] Jones v. Comm'r of Soc. Sec., 181 Fed. Appx. 767, 771 (11th Cir. 2006) (quoting Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999)).

## V. CONCLUSION

In view of the foregoing, it is hereby **ORDERED** that the decision of the Commissioner is **REVERSED** and **REMANDED** under sentence four of 42 U.S.C. § 405(g). Upon remand the Commissioner should: (1) reassess Plaintiff's mental RFC with proper consideration of the opinions of record from treating psychiatrist, Dr. Nanjundasamy and with a discussion of the evidence supporting the assessment; (2) obtain VE testimony based on a hypothetical that accurately reflects Plaintiff's new RFC to determine whether Plaintiff can perform other work given her exertional and non-exertional limitations; and (3) conduct such further proceedings as the Commissioner deems appropriate. The Clerk is directed to enter final judgment in favor of Plaintiff consistent with this Order and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on January 27, 2009.

GARY R. JONES
United States Magistrate Judge

Copies to:
All Counsel